IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 22-cv-00037-KLM

RYAN MILLER,

    Plaintiff,

v.

SECURA SUPREME INSURANCE COMPANY, and
SECURA INSURANCE COMPANY,

    Defendants.

_____

**ORDER**
_____

**ENTERED BY MAGISTRATE JUDGE KRISTEN L. MIX**

This matter is before the Court on Plaintiff's **Motion to Limit and Strike the Opinions of Defendant's Medical Expert, B. Andrew Castro, M.D.** [#38] (the "Motion"). Defendant filed a Response [#39] in opposition to the Motion [#38], and Plaintiff filed a Reply [#45]. The Court has reviewed the briefs, the entire case file, and the applicable law, and is sufficiently advised in the premises. For the reasons set forth below, the Motion [#38] is **DENIED**.[1]

**I. Background**

This case relates to Plaintiff's claim for uninsured and underinsured motorist ("UIM") benefits under his automobile insurance policy issued by Defendants. *See Compl.* [#5] ¶¶ 6, 8. Plaintiff was injured in a car accident on October 18, 2018, and

---

[1] This case has been referred to the undersigned for all purposes pursuant to D.C.COLO.LCivR 40.1(c) and 28 U.S.C. § 636(c), on consent of the parties. *See* [#12, #13].

- 1 -

Defendants opened a claim on behalf of Plaintiff on October 19, 2018.  *Id.* ¶¶ 12, 20.  Defendants reviewed Plaintiff's medical records relating to the collision and a separate car accident which had occurred in 2017 and sent Plaintiff a check for advance UIM benefits in the amount of $22,426.71.  *Id.* ¶¶ 34, 38.  In making this payment, Defendants advised Plaintiff that they disputed "the cause and extent of [Plaintiff's] claimed injuries and damages as they relate to the 10/18/18 accident versus the [2017] accident."  *Id.* ¶ 34.  Plaintiff disputed the amount of UIM benefits he received, asserting that the "UIM [p]ayment was insufficient to cover his injuries, damages and losses sustained as a result of the [c]ollision."  *Id.* ¶ 35.  Defendants again "disputed the reasonableness and necessity of the medical expenses [Plaintiff] had incurred and [informed Plaintiff] that [while they had advanced the amount of $22,426.71 as a UIM Settlement Offer,] [they[ had no legal or contractual obligation to make an advance payment[.]"  *Id.* ¶ 36.

As a result of the ongoing dispute relating to the source of Plaintiff's injuries and the necessity of the treatments he had been receiving, Defendants requested that Plaintiff attend an independent medical evaluation conducted by B. Andrew Castro, M.D. ("Castro").  *See Compl.* [#5] ¶¶ 39-46.  Dr. Castro performed an examination of Plaintiff on May 17, 2021.  *Id.* ¶ 46.  In the report he issued following that examination, Dr. Castro wrote, in part:

> **MEDICAL RECORD REVIEW:** <u>ACCIDENT REPORTS:</u> . . . 04/11/2017: Office S. Brandon.  This documents a motor vehicle accident between Charles Spaur driving a 2012 Honda Civic and Ryan Miller driving a 2005 Toyota Tundra.  It appears that Mr. Miller's car, as well as Mr. Spaur's car sustained moderate damage.

*Pl.'s Ex. A, May 17, 2021 Report by Dr. Castro* [#38-1] at 4.  Dr. Castro further wrote:

> <u>PHOTOGRAPHS:</u> Photographs highlight a KIA sedan that has substantial front end damage with hood damage and front bumper and grill damage.

> This apparently struck the back of a pickup truck. The damage to the hood is pushed up. It would appear that this went under the bumper of a pickup truck that perhaps had an elevated bumper. There is a Chevy Silverado that has rear end damage consistent with largely bumper damage. The bumper was pushed forward and underneath the truck bed. It would not appear that there is substantial damage elsewhere, but these are very limited photographs of the rear end or the body panels. The front of the truck does also have grill and front bumper damage presumably where the Chevy Silverado pickup truck impacted the next car in line. The bumper, grill assembly, headlight assemblies, and perhaps hood are damaged. It would not appear that the front fender or door panels are substantially involved from this limited view. The next car is the rear end of a Subaru Outback. This car has some rear trunk lid damage where it was impacted presumably by the Silverado pickup truck. The rear hatchback window was not broken. The taillights are not broken. This seems to be a blunt impact at or around the license plate and into the trunk lid which is buckled in and perhaps there is some bumper damage itself. The rear bumper cover contacts or the rear fender does not seem to be substantially damaged. The bumper cover does have some damage. The next photographs highlight the front end of the Subaru Outback. There appears to be some minor damage and a solitary perhaps impression impact from a round point area which would be likely consistent with the trailer hitch of Mr. Miller's car. The front of the Subaru sustained what appears to be minimal damage aside from the trailer hitch impression. There is some front bumper cover damage as it seats into the headlight assembly and front fender on the passenger side, but there does not appear to be substantial damage other than the impact with the trailer hitch. The next photos are of a Toyota Tundra with a projecting bumper hitch. This would appear to match with the front bumper of the Subaru. The bumper does not appear to be substantially damaged itself. The bumper relationship to the back of the car seems to be stable and there does not appear to be substantial body panel disruption elsewhere. Perhaps, the bumper is pushed in somewhat, but it is hard to see substantial damage to the rear bumper of the Toyota Tundra.

*Id.* at 16-17. Based on his review of all the materials presented to him and his examination of Plaintiff, Dr. Castro then concluded, in part:

> I believe the patient sustained quite a minor accident as a result of the 10/19/2018 motor vehicle accident with a very low-velocity strike into his trailer hitch which did not provide any substantial damage to the trailer hitch itself or bumper. I would be happy to review any damage assessments which are not available in my packet, but it would appear that this was a low-energy, low-velocity bump, comparing his trailer hitch to the impression made by the Subaru. It can be appropriately assumed that there is substantial subsequent force dampening as the cars are struck from behind

> him. Being either the fourth or fifth car in line, Mr. Miller sustained very little force when he was struck from behind and I do not believe he sustained any worsening of his condition or any substantial injury as a result of this extremely low-velocity motor vehicle accident. This care provided in this case seems to be consistent with a classic medical lien-type treatment algorithm with over utilization of modalities such as chiropractic, physical therapy, and subsequent referral for multiple injections which did not provide any substantial diagnostic information or treatment. In my opinion, surgical intervention as previously stated is not indicated at all with regards to either motor vehicle accident and certainly is not related to the second motor vehicle accident which was a low velocity impact and did not cause increased structural trauma.

*Id.* at 17. Finally, Dr. Castro responded to several specific interrogatories posed by Defendant wherein he mentioned the velocity of the vehicle hitting the vehicle that Plaintiff was in:

> One could expect this and this would be consistent with perhaps a somewhat more substantial motor vehicle accident of 2017 rather than the low-velocity accident of 2018. . . .
>
> The motor vehicle accident of 10/19/2018 was quite minor and I would agree that the all of the complaints and treatments were related to the 04/11/2017 motor vehicle accident. . . .
>
> I do not believe he sustained any substantial traumatic injuries related to the 10/19/2018 accident, which was a very low-velocity impact. . . .
>
> Certainly, the accident of 10/19/2018 is a much lower velocity injury, which in my opinion did not cause any structural damage to his cervical spine. His neck pain was somewhat out of proportioned and nonphysiologic throughout, but I think one could assume that the relatively higher impact motor vehicle accident with regards to forces imparted to his spine are from the 04/11/2017 accident. . . .
>
> I do not relate any of these as being related to the 10/19/2018 accident, which is a very low-velocity accident. . . .

*Id.* at 19-22.

On July 9, 2021, after reviewing Dr. Castro's expert report, Defendants "continue[d] to dispute the cause and extent of [Plaintiff's] claimed injuries and damages as they

- 4 -

relate[d] to the [Collision] versus the [2017] accident[,]" and denied Plaintiff's claim for additional UIM benefits.  *Id.* ¶ 49.  On December 16, 2021, Plaintiff brought this action against Defendants, asserting claims for unlawful delay and denial of UIM benefits under Colo. Rev. Stat. §§ 10-3-1115 and 1116, breach of insurance contract, and bad faith breach of insurance contract.  *See Compl.* [#5] ¶¶ 64-89.

On April 6, 2023, Dr. Castro's deposition was taken:

Q: We're talking about this collision.  You -- you threw in that bit about a low-velocity accident.  You didn't do a biomechanical analysis in this case, did you, Doctor?

A: No, I didn't.

Q: What does it take to do a biomechanical acc- -- I will start over.  If you were doing a biomechanical analysis of this collision, what would you need to see and what would you do?

MS. STAFFORD: Objection; foundation.

A: I'm not a biomechanical engineer and professional engineer by license here.  But I would want to try to understand the best we can the delta velocity of the two vehicles, which would be, and by all accounts, low in this case, and put together as much information as we can about repair estimates.  That would be one part.

Q (By Mr. Landry): And you don't have any of the repair estimates, correct?

A: I don't remember seeing them, no.

Q: You looked at some photographs, correct?

A: Yes.

Q: And the police reports?

A: Correct.

*Pl.'s Ex. C, Depo. of Castro* [#38-3] at 27:1-25.

> Q: Yes.  What does the speed of the vehicles or the velocity of the impact in the collision have to do with the opinions you've expressed in the reports of -- of May 17, 2021 or December 9th of 2021, if anything at all?
>
> A: So the velocity of an accident, being a low-velocity accident, by all accounts this was a low-velocity accident.  He had minimal property damaged.  The car that struck him had minimal damage.  With a high contact stress of the trailer hitch that hit right on the bumper and caused just a punch in her bumper.  So her bumper wasn't destroyed.  Her hood wasn't destroyed.  His car wasn't destroyed.  That's a low-velocity accident.  His head -- as an equal and opposite reaction, his head would have projected into the headrest behind him.  And that would probably a delta velocity of less than 10 miles an hour, I'm sure -- well, I would -- I would predict.  And as such, that, in my opinion, is my definition of a low-velocity accident.  Now, if someone is hit head on or hit from the side and they had a lot of jostling left or right, that would be a much more concerning mechanism.
>
> Q: So, in other words, if someone is hit at the same velocity, but it comes in from the side or from the front, that would cause the neck to move around more?
>
> A: Yes, because you don't have the head restrained.  If you're hit from the side, your head is going to get toward the side you get hit on, or the opposite way.  If you get from head on, your head is going to go forward sometimes.  Again, if it's 60 miles an hour hitting a bridge abutment, it's – it's a lot of force.  If you're going 3 miles an hour, it's not that much force.  But when you get hit from behind,

inherently your head cannot move very much because the headrest will stop your head from projecting backwards. Your lumbar spine doesn't move at all.

*Id.* at 31:4-32:15.

Q (By Mr. Landry): Okay. And why doesn't it apply to this case?

A: Because, A, it's a low velocity – extremely low velocity. And, secondary, the -- I -- I don't see that the trailer hitch bent or the bumper where it's attached bent substantially. I didn't see any property damage, perhaps. And the point of impact with the highest forces is right at the tip of that trailer hitch ball, which pushed into the bumper of the other driver.

Q: So you keep on saying that this is a low-velocity collision, correct?

A: Yes.

Q: What was the velocity then? If you didn't do an analysis -- I mean, the velocity means the speed of something, correct?

A: Correct.

Q (By Mr. Landry): Well, Doctor, I mean, you're the one that keeps on using the word "velocity." Please define velocity for us.

A: I -- I just said correct.

Q: Okay. So velocity means the speed of something in a given direction.

A: Okay.

Q: So what was the speed of the vehicle that hit Mr. Miller's vehicle?

A: Actually, low velocity means low-speed accident. I would say that the more important data is delta velocity, change of velocity between two vehicles, which would be considered low velocity.

>Q: Okay. So what is the delta-v for this collision?
>
>A: I don't know. Very -- it would be low.
>
>Q: Well, I mean, low. What does "low" mean?
>
>A: 5, 8 miles an hour or less would be a guess. I don't know.
>
>Q: Okay. And just to be clear, I mean, you're guessing. You don't know –
>
>A: I'm basing that on the damage assessments of the car.
>
>Q: You don't know what the delta-v for this collision is, correct?
>
>A: That's correct.
>
>Q: Okay. And you don't know the velocity of the impact vehicle, correct?
>
>A: Again, the delta-v depends on the velocity of two vehicles, but I don't know those either, correct.

*Id.* at 36:7-38:35.

On May 8, 2023, Defendants disclosed an Addendum Report written by Dr. Castro, which included answers to other interrogatories posed by Defendants, including statements that:

>I do not attribute any substantial disability, impairment, or substantial injury to the second accident other than there were mild sprain/strains from this low-velocity injury. . . .
>
>I would agree that a cervical spine that has had surgery and disc replacement would not be the same as it was prior to surgical intervention, and perhaps this is what he is referring to; however, the surgical intervention is unrelated to the accident in question, and therefore the "permanency" is not causally related to the low velocity motor vehicle accident from 10/19/2018. . . .

*Pl.'s Ex. B, May 8, 2023 Addendum Report by Dr. Castro* [#38-2] at 3-4.

In the present Motion [#38], Plaintiff seeks to limit certain portions of Dr. Castro's opinions under Rule 702, specifically to the extent he discusses the velocity at impact of the accident, and to strike the May 8, 2023 Addendum provided by Dr. Castro, based on purported untimeliness.[2]

## II.  Standard of Review

Rule 702 of the Federal Rules of Evidence provides that:

> A witness who is qualified as an expert may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Based on this rule, admission at trial of expert testimony requires a two-step analysis. *103 Invs. I, L.P. v. Square D Co.*, 470 F.3d 985, 990 (10th Cir. 2006). "First, the court must determine whether the expert is qualified by 'knowledge, skill, experience, training, or education' to render an opinion." *Id.* (citation omitted). "Second, if the expert is sufficiently qualified, the court must determine whether the opinion is reliable under the principles set forth in *Daubert*." *Id.* (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993)).

---

[2] In his Reply [#45], Plaintiff also raises Fed. R. Evid. 401 and Fed. R. Evid. 403 as bases to exclude certain portions of Dr. Castro's background.  *See Reply* [#45] at 3.  However, these arguments were not made in the Motion [#38].  Unless exceptional circumstances exist, the Court does not "consider arguments made for the first time [in a] reply brief and deem[s] those arguments waived."  *United States v. Leffler*, 942 F.3d 1192, 1197-98 (10th Cir. 2019) (citations omitted); *see also United States v. Vann*, No. 1:12-cr-0966 PJK-SMV, 2023 WL 3335983, at *2 (D.N.M. May 10, 2023) (applying *Leffler* to hold that an argument raised for first time in a reply brief was waived).  Here, the information Plaintiff seeks to exclude under those rules was available to Plaintiff at the time the Motion [#38] was filed, as it was contained in Dr. Castro's previously disclosed Curriculum Vitae.  Thus, the Court finds that exceptional circumstances do not exist, and that Plaintiff waived his arguments under Rules 401 and 403.

The Court has a "gatekeeping role" in deciding whether to admit or exclude expert testimony and must determine that the testimony is both reliable and relevant. *Daubert*, 509 U.S. at 589, 597. An opinion is reliable if the reasoning or methodology of the expert is valid and "can be applied to the facts in issue." *Id.* at 592. When assessing reliability, "the court may consider several nondispositive factors: (1) whether the proffered theory can [be] and has been tested; (2) whether the theory has been subject to peer review; (3) the known or potential rate of error; and (4) the general acceptance of a methodology in the relevant scientific community." *103 Invs. I, L.P.*, 470 F.3d at 990 (citing *Daubert*, 509 U.S. at 593-94). These considerations are not exhaustive. Rather, "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). Ultimately, the test requires that the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of any expert in the relevant field." *Id.* An opinion is relevant if it "will assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.*

Ultimately, the determination of whether expert testimony should be admitted is within the sound discretion of the trial court. *Vining v. Enter. Fin. Grp.*, 148 F.3d 1206, 1218 (10th Cir. 1998). "[T]he rejection of expert testimony is the exception rather than the rule." *O'Sullivan v. Geico Cas. Co.*, 233 F. Supp. 3d 917, 922 (D. Colo. 2017) (quoting Fed. R. Evid. 702 advisory committee's note). "[T]he trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system . . . . Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of

proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.*

While the proponent of the challenged testimony has the burden of establishing admissibility, its proffer is tested against the standard of reliability, not correctness; a proponent need only prove that "the witness has sufficient expertise to choose and apply a methodology, that the methodology applied was reliable, that sufficient facts and data as required by the methodology were used and that the methodology was otherwise reliably applied." *United States v. Crabbe*, 556 F. Supp. 2d 1217, 1221 (D. Colo. 2008) (citing *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 781 (10th Cir. 1999)).

### III.  Analysis

**A.     Dr. Castro's Opinions Mentioning Velocity**

Plaintiff categorizes Dr. Castro's statements regarding velocity as "opinion" which should be excluded from his testimony.  However, as explained below, the Court disagrees with this categorization.  Dr. Castro extrapolates, from the evidence he reviewed, that the vehicle impact occurred at a low velocity, and he uses that extrapolated fact as a basis for his medical opinions.  To the extent that Plaintiff believes this extrapolated fact to be wrong, he may attempt to show this during trial and thereby undermine Dr. Castro's medical opinions due to purportedly faulty logic or a weakened factual base.  However, exclusion under Rule 702 is not appropriate.

**1.     Qualifications**

In determining whether expert testimony is admissible, the district court must first determine whether the expert is qualified "by knowledge, skill, experience, training, or education" to render an opinion. *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir.

2009). Plaintiff argues that, by testifying regarding the velocity of the vehicle which hit the vehicle Plaintiff was in, Dr. Castro is opining outside his knowledge, skills, experience, training, and education. *Motion* [#38] at 12-13.

Acceptance or rejection of an expert witness's qualifications is a matter within the discretion of the trial court. *United States v. Dysart*, 705 F.2d 1247, 1251 (10th Cir. 1983). "The decision to exclude evidence is a drastic sanction." *Brookman v. Dillon Cos., LLC*, No. 19-cv-03292-KLM, 2021 WL 3046915, at *4 (D. Colo. July 19, 2021). While specialization is not required, courts will look to whether the proffered testimony is "within the reasonable confines" of the expert's subject area. *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 (10th Cir. 2001). "[A] lack of specialization does not affect the admissibility of [the expert] opinion, but only its weight." *Id.* at 971 (quoting *Compton v. Subaru of Am., Inc.*, 82 F.3d 1513, 1520 (10th Cir. 1996). "The trial court should not exclude expert testimony simply because the court feels that the proffered witness is not the most qualified or does not have the specialization considered most appropriate by the court." *Lovato v. Burlington N. & Santa Fe Ry. Co.*, No. CIV.A. 00-RB-2584CBS, 2002 WL 1424599, at *3 (D. Colo. June 24, 2002).

In the present case, the Court finds that Dr. Castro's statements describing the collision as a "low-velocity motor vehicle accident" are within the reasonable confines of the subject area of his expertise, i.e., causation underlying Plaintiff's claimed injuries. *See Response* [#39] at 3 (stating that Dr. Castro has "training and professional experience in treating patients with orthopedic and spinal injuries who have been involved in motor vehicle accidents"). The fact that Dr. Castro is not a vehicle-accident reconstruction (or similar) expert does not prevent him from looking at the data underlying the accident to

help him form an opinion about the injuries incurred by Plaintiff in this case. *See id.* ("First and foremost, it should be noted that Dr. Castro was never endorsed, nor is he intended to opine at the time of trial, regarding any biomechanical or accident reconstruction issues.").

Dr. Castro has a Master of Science in Bioengineering with a concentration in Biomechanics, had a Spinal Biomechanics teaching post, and has authored multiple publications and made multiple presentations on Spinal Biomechanics. *Response* [#39] at 4 n.3 (citing *Defs.' Ex. A to Ex. 5, Dr. Castro's Curriculum Vitae* [#39-5] at 5-9). However, as Defendants state, it is clear from reading the reports that Dr. Castro did not rely on his background, training, education, experience, and expertise in spinal biomechanical analysis to render any biomechanical, velocity, or speed opinion in his reports, as Dr. Castro confirmed in his deposition. *Response* [#39] at 4 (citing *Defs.' Ex. 7, Depo. of Castro* [#39-7] at 30:06-32:15, 35:01-38:03, 67:11-70:09). Rather, as Defendants note, it is customary for a physician in cases like this one to review information reported by the plaintiff and in the medical records and accident documentation in order to inform the physician's overall assessment of the claimed injuries. *Response* [#39] at 4.

The relevant standard is not whether the expert has identical experience to the underlying circumstances of the case, but whether his "technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue." Fed. R. Evid. 702(a). To the extent that Plaintiff argues that Dr. Castro's experience is too attenuated from the factual circumstances underlying this case, that is something "opposing counsel can no doubt highlight on cross-examination, and which

bears on the weight or credibility of [Dr. Castro's] opinions, but not on their admissibility." *O'Sullivan*, 233 F. Supp. 3d at 924; *see Wheeler v. John Deere Co.*, 935 F.2d 1090, 1100 (10th Cir. 1991) ("An expert must, however, stay within the reasonable confines of his subject area and cannot render expert opinions on an entirely different field or discipline.") Any dispute as to Dr. Castro's qualifications in this area is fodder for Plaintiff's cross-examination at trial. *See Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

### 2. Sufficient Facts or Data

Rule 702(b) requires that expert testimony be based on sufficient facts or data. Fed. R. Evid. 702(b). Expert testimony must be supported by "appropriate validation—i.e., 'good grounds,' based on what is known." *Daubert*, 509 U.S. at 590. Opinion evidence need not be admitted when it is "connected to existing data only by the *ipse dixit* of the expert."[3] *Rodgers v. Beechcraft Corp.*, 759 F. App'x 646, 658 (10th Cir. 2018) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). A court may find that there is just too great an analytical gap between the data and opinion offered for it to be reliable. *Id.*; *see also Gencorp Inc.*, 165 F.3d at 782 ("A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."). The district court has wide discretion to determine whether these standards have been met. *Goebel v. Denver & Rio Grande W.R.R. Co.*, 346 F.3d 987, 990 (10th Cir. 2003).

Dr. Castro's medical opinions on the causation of Plaintiff's claimed injuries are based on his review of various accident documents (including the post-accident police

---

[3] "Ipse dixit" is a Latin term which translates to "he himself said it." *Ipse Dixit*, *Black's Law Dictionary* (11th ed. 2019). In legal contexts, it refers to something asserted but not proved. *Id.*

photographs which show little damage to the vehicle Plaintiff was in), his interview and physical examination of Plaintiff, the reporting of the Plaintiff and others in accident documents, and Plaintiff's medical records. *Response* [#39] at 3. This is not a situation where a physician is relying on a fact (i.e., the approximate velocity of the vehicles at impact) with *no* basis in the underlying record. Thus, the Court finds that Dr. Castro's testimony is based on sufficient facts and data. To the extent that Plaintiff calls into question the facts or data on which Dr. Castro based his conclusion, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" are the appropriate means of attack. *Daubert*, 509 U.S. at 596.

### 3.   Reliable Principles and Methods

Finally, Plaintiff argues that Dr. Castro's statements regarding velocity are not based on reasonably applying reliable principles and methods to the facts of this case. *Motion* [#38] at 13.

Generally, the district court should focus on the experts' methodology and not the conclusions generated. *Hollander*, 289 F.3d at 1205; *see also Daubert*, 509 U.S. at 595. The proponent of the testimony need neither prove that the expert is indisputably correct nor show that the expert's theory is generally accepted in the scientific community. *Truck Ins. Exch. v. MagneTek, Inc.*, 360 F.3d 1206, 1210 (10th Cir. 2004) (citing *Gencorp Inc.*, 165 F.3d at 781). Instead, the proponent of the testimony must show that the method employed by the expert in reaching the offered conclusion or opinion is scientifically sound. *Id.*

However, the Court finds that Dr. Castro's methods of reviewing the records provided to him are scientifically sound. The Court acknowledges that it is common for

trained experts to extrapolate from existing data. *Gencorp Inc.*, 165 F.3d at 782. Further, because Dr. Castro in fact did not reach an ultimate conclusion about the velocity at the time of impact, but instead extrapolated this fact from the information before him in order to reach his ultimate medical opinions, the Court finds that the underlying methodology to arrive at that conclusion is adequate. If Plaintiff disputes this methodology or believes it to be scientifically unsound, that is appropriate fodder for cross-examination as it goes to the weight, not the admissibility, of Dr. Castro's testimony. *See Tingey v. Radionics*, 193 F. App'x 747, 767 (10th Cir. 2006) (finding that disputes as to faults in an expert's methodology go to the weight, not the admissibility of the testimony).

For the foregoing reasons, the Court finds that the expert testimony proffered by Defendants is based on sufficient facts or data and is based on reasonably applying reliable principles and methods to the facts of this case. Therefore, the expert testimony is not inadmissible under Rule 702.

**B.     May 8, 2023 Addendum Report by Dr. Castro**

In the Motion [#38], Plaintiff also asserts that the May 8, 2023 Addendum Report by Dr. Castro "should be stricken in its entirety because it was served 13 days after the April 28, 2023 deadline for parties to designate rebuttal witnesses." *Motion* [#38] at 9. Plaintiff provides no further argument or legal citation supporting this statement beyond saying that it was an "untimely disclosure." *Id.* at 13. Plaintiff does nothing to expand on this argument in his Reply [#45], merely stating that the Court should "strik[e] all of the opinions contained in the ADDENDUM of Dr. Castro dated May 8, 2023." *Reply* [#45] at 7.

Defendants provide a thorough response to Plaintiff's bare-bones argument. *See Response* [#39] at 17-20. First, despite Plaintiff's failure to cite the relevant Federal Rules of Civil Procedure, Defendants assume that the request to strike the Addendum is made pursuant to Fed. R. Civ. P. 37(c) based on failure to timely comply with the disclosure requirements of Fed. R. Civ. P. 26(a)(2). *Id.* at 17. Defendants then state:

> Plaintiff relies on Defendant's [sic] deadline for rebuttal expert disclosures, but elides that Defendant [sic] endorsed Dr. Castro in their timely and compliant prior initial expert disclosures. The Addendum's disclosure accordingly invokes supplementation of those prior disclosures under F.R.C.P. 26(e). The Addendum was an appropriate, seasonable supplementation of Defendant's [sic] initial expert disclosures under F.R.C.P. 26(e) because: (a) Defendant [sic] disclosed the Addendum prior to the discovery and F.R.C.P 26(a)(3) pre-trial disclosure deadlines in this case; and (b) the Addendum addressed new information not available when Dr. Castro prepared his initial reports and opinions (i.e., Dr. James' newly-disclosed report). The Addendum was not intended to solely contradict or rebut Plaintiff's own expert disclosures, did not merely seek to emphasize or highlight Dr. Castro's prior reports and opinions, and did not add a new (or change a prior) medical causation opinion in reliance on specific information . . . possessed when he prepared the initial reports.

*Id.* at 17-18 (internal citations, quotation marks, and brackets omitted).

Defendants then argue in the alternative that, "even if the rebuttal expert disclosure deadline applied to the timing of the Addendum's disclosure, the late disclosure was justified and harmless." *Id.* at 18. In support, Defendants assert that: (1) "Defendants' initial and rebuttal expert disclosures timely named Dr. Castro and the subject(s) of the Addendum"; (2) "Plaintiff knows the basis and factual underpinnings of Dr. Castro's opinions in the Addendum (as well as Dr. Castro's deposition testimony) and the Addendum did not add a new or change any prior opinion previously disclosed"; (3) "Plaintiff had a full opportunity within their deposition of Dr. Castro to depose him on the subject(s), basis, and factual underpinning(s) of the Addendum"; (4) "[t]he parties always

- 17 -

anticipated rebuttal disclosures after Dr. Castro's expert deposition and the Addendum was disclosed before the discovery cut-off disclosure deadline in a manner permitting Plaintiff to have moved to re-open Dr. Castro's deposition"; (5) "Plaintiff has a full and unfettered ability to challenge Dr. Castro on cross-examination and challenge at trial on what is stated in the Addendum"; (6) "[t]here is nothing conceivably disruptive of the trial to allow Dr. Castro to testify to what is in the Addendum"; and (7) "[t]here is nothing in the Motion indicative of bad-faith or willfulness in Defendant's [sic] timing of the Addendum's disclosure, but rather, bad faith or willfulness on Plaintiff's part – particularly, when Defendant's [sic] counsel permitted Plaintiff to make untimely affirmative expert disclosures, [and] Plaintiff's counsel represented that reciprocal professional courtesies would be extended to Defendant [sic] in this action."  *Id.* at 18-19 (citing *Defs.' Ex. 5, Defs.' Mar. 31, 2023 Disclosure of Expert Testimony Pursuant to Fed. R. Civ. P. 26(a)(2)* [#39-5]; *Defs.' Ex. 6, Defs.' Apr. 28, 2023 Disclosure of Rebuttal Expert Testimony Pursuant to Fed. R. Civ. P. 26(a)(2)* [#39-6]; *Defs.' Ex. 14, June 15, 2023 Decl. of Elaine K. Stafford, Esq.* [#39-14] ¶¶ 6-15).

> Defendants then provide additional detail regarding (7) above, stating:
>
> Importantly, preceding Defendant's [sic] disclosure of Dr. Castro's Addendum, untimely expert disclosures by Plaintiff were professionally agreed-to by Defendant's counsel in courtesy to Plaintiff's counsel, despite their non-approval by the Court and despite the requests to make late disclosure coming after the affirmative expert disclosure deadline, and in appreciative response, Plaintiff's counsel orally represented to Defendant's [sic] counsel that the same professional courtesies would be extended to Defendant [sic] if any issue arose with respect to the timing of Defendant's [sic] rebuttal expert disclosures.

*Id.* (citing *Defs.' Ex. 14, June 15, 2023 Decl. of Elaine K. Stafford, Esq.* [#39-14] ¶¶ 6-9).

- 18 -

For the reasons provided by Defendant, the Court finds that Dr. Castro's May 8, 2023 Addendum should not be stricken, particularly in light of Plaintiff's failure to rebut, or even to address, any of Defendant's arguments. Even assuming that Defendants' rebuttal expert disclosure deadline applied to the timing of the Addendum's disclosure (a point on which the Court makes no ruling), there is no indication that the timing of the disclosure was unjustified or harmful. In making that determination, the Court considers (1) the prejudice or surprise to Plaintiff; (2) the ability of Plaintiff to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) Defendants' bad faith or willfulness. *See Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 953 (10th Cir. 2003). Here, there is no indication of prejudice or surprise to Plaintiff, and thus no need to cure any prejudice; there is no indication that permitting Dr. Castro's testimony on the Addendum would disrupt trial; and there is no indication of any bad faith or willfulness on Defendants' part. Thus, all four factors weigh against striking the Addendum.

Accordingly, the Motion [#39] is **denied** to the extent Plaintiff seeks to have Dr. Castro's May 8, 2023 Addendum stricken.

### III. Conclusion

For the reasons stated above,

IT IS HEREBY **ORDERED** that the Motion [#38] is **DENIED**.

DATED: July 6, 2023

BY THE COURT:

Kristen L. Mix
United States Magistrate Judge